**DICKINSON WRIGHT PLLC**
John L. Krieger, Esq., Nevada Bar No. 6023
Kevin D. Everage, Esq., Nevada Bar No. 15913
Brady A. Bathke, Esq., Nevada Bar No. 16191
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169
Telephone (702) 550-4400
Facsimile (844) 670-6009
Email: jkrieger@dickinson-wright.com
Email: keverage@dickinson-wright.com
Email: bbathke@dickinson-wright.com

**AMERICAN CIVIL LIBERTIES UNION OF NEVADA**
Christopher Peterson, Esq., Nevada Bar No. 13932
Jacob Smith, Esq., Nevada Bar No. 16324
4362 W. Cheyenne Ave.
North Las Vegas, Nevada 89032
Telephone (702) 366-1226
Email: peterson@aclunv.org
Email: jsmith@aclunv.org

**NATIONAL ASSOCIATION OF THE DEAF**
Brittany Shrader (*pro hac vice to be submitted*)
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Phone: (301) 587-2907
brittany.shrader@nad.org

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTOPHER JONES,<br><br>                              Plaintiff,<br><br>vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a municipal corporation,<br><br>                              Defendant. | Case No:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>(1) Discrimination on the Basis of Disability in Violation of Title II of the ADA (42 U.S.C. § 12131, et seq.)<br><br>(2) Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794, et seq.)<br><br>(3) Violation of the Due Process Clause of the Fourteenth Amendment for a Deliberate |

Indifference to a Substantial Risk of Harm to Health and Safety Prior to Conviction (42 U.S.C. § 1983)

(3) Violation of the Eighth Amendment for a Deliberate Indifference to a Substantial Risk of Harm to Health and Safety after Conviction (42 U.S.C. § 1983)

(4) Violation of Article 1, § 6 of the Nevada Constitution for a Deliberate Indifference to a Substantial Risk of Harm to Health and Safety after Conviction

**JURY TRIAL DEMANDED**

For its complaint against Defendant Las Vegas Metropolitan Police Department ("LVMPD"), Plaintiff Christopher Jones ("Jones"), by and through counsel, hereby alleges and complains as follows:

## I.        NATURE OF THE CASE

This is an action for discrimination on the basis of disability pursuant to 42 U.S.C. § 12131, *et seq.* and 29 U.S.C. § 794, *et seq.*; violations of the Eighth Amendment's prohibition on cruel and unusual punishments for deliberate indifference to a substantial risk of harm to health and safety pursuant to 42 U.S.C. § 1983 after conviction; and violations of Article 1, § 6 of the Nevada Constitution for a deliberate indifference to a substantial risk of harm to health and safety after conviction. This action is a result of the pervasive mistreatment of deaf and hard of hearing people incarcerated at Clark County Detention Center ("CCDC") by Defendant's failure to provide qualified sign language interpreters, videophones, and simple modifications to CCDC programs, procedures, and practices to ensure effective communication for Plaintiff's disability.

## II.        JURISDICTION

1.        The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.        The Court has personal jurisdiction over LVMPD because it is a municipal corporation in the State of Nevada that operates the largest jail in the state, the Clark County

Detention Center ("CCDC"). LVMPD incarcerates over 70,000 people annually at CCDC.

3.     Venue properly lies within the unofficial Southern Division of the United States District Court for the District of Nevada pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this cause of action took place in Clark County, Nevada, which is in that jurisdiction.

### III.     PARTIES

4.     Jones is a person who, at all times relevant to this complaint, was confined at CCDC in Las Vegas, Nevada, and under the jurisdiction of the State of Nevada.

5.     LVMPD is a municipal corporation located in the State of Nevada and operates CCDC, which is located at 330 South Casino Center Boulevard, Las Vegas, Nevada 89101.

6.     LVMPD wholly operates and controls CCDC.

7.     LVMPD is responsible for the hiring, control, and supervision of all of CCDC's staff, medical staff, and corrections officers and agents.

8.     CCDC's staff are all LVMPD employees or contractors.

9.     LVMPD is required to provide services and auxiliary aids to deaf people detained at CCDC to ensure they have a similar experience as hearing people.

10.     However, LVMPD fails to ensure effective communication access to deaf and hard of hearing people in its custody, by depriving them of necessary auxiliary aids and services and reasonable modifications.

### IV.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

11.     Effective communication with officers, counselors, wardens, and other prison staff is essential for all incarcerated people.

12.     People detained at CCDC are wholly dependent on LVMPD staff for medical, dental, educational, mental health, employment, and religious needs, among other services.

13.     People detained at CCDC are also dependent on LVMPD staff for all of their basic daily needs, including food, exercise, and safety.

14.     American Sign Language ("ASL") is a language used by many deaf and hard of

hearing people in the United States.

15.    For many deaf and hard of hearing people, ASL is their primary or only means of communication.

16.    Many deaf people whose primary language is ASL have extremely limited literacy in reading or writing English.

17.    Like spoken languages, ASL has its own unique rules of grammar and syntax—it is not merely a 1:1 translation of words into signs, nor is it simply English on the hands.

18.    ASL has no written component.

19.    Jones is deaf and his primary and preferred language is ASL.

20.    Jones's ability to read and write the English language or understand English grammar and syntax rules is limited because the English language entirely different from his primary and preferred language of ASL.

21.    For deaf people whose primary language is ASL, qualified ASL interpreters are often necessary to ensure effective communication with people who are not proficient in ASL.[1]

22.    Speech-reading[2], fingerspelling[3], or *ad hoc* gestures are not effective means of communication for people who communicate in ASL.

23.    Notes and other writings are almost never an effective communication tool for deaf

---

[1] A qualified interpreter is "an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." U.S. Dep't of Just., Americans with Disabilities Act Title II Regulations, Section 35.104, https://www.ada.gov/law-and-regs/title-ii-2010-regulations/. For some deaf people, qualified interpretation requires a team of interpreters, including both an ASL interpreter (who is hearing and who can interpret from English to ASL), and a Certified Deaf Interpreter ("CDI"). A CDI is a deaf person who works with the ASL interpreter to facilitate effective communication.

[2] Speech-reading is the ability to understand some portion of speech by carefully watching the lip patterns and movement of the tongue and face of the person speaking, and is more commonly known as "lip reading." Only a small amount of the spoken sounds of aural language are visible, and many sounds appear identical on the lips. However, a large part of Jones' detention was during the COVID-19 pandemic when masks that covered the mouth were required, reducing the efficacy of this method even further.

[3] Fingerspelling is the process of spelling out words by using hand shapes that correspond to the letters of the word (the signed alphabet).

people, particularly for complex and important topics such as medical care, mental health care, prison rules and requirements, disciplinary hearings, or parole and probation requirements.

24.  For deaf and hard of hearing people who are fluent in both ASL and English, written notes may sometimes be effective for simple interactions, but most deaf and hard of hearing people who are bilingual in ASL and English still require ASL interpreters for complex or important interactions.

25.  Speech-reading is virtually never an effective communication method for a deaf or hard of hearing person.

26.  CCDC is the largest detention center in Nevada, incarcerating over 70,000 people annually.

27.  LVMPD is aware of its obligations under law, including the ADA, the Rehabilitation Act, the United States Constitution, and the Nevada Constitution, to provide services and auxiliary aids to deaf people detained at the facility to ensure they have an equal opportunity to benefit from and participate in CCDC's programs, services, and activities as hearing people.

28.  LVMPD receives "[f]ederal financial assistance" for CCDC within the meaning of 29 U.S.C. § 794(a).

29.  The operations of CCDC are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)—(B) and/or (b)(2)(B).

30.  CCDC's Inmate Handbook and written policies detail LVMPD's responsibilities and obligations under law.

31.  As far back as 2004, LVMPD offered trainings for its CCDC staff on the rights of deaf people detained at the facility and the services to which deaf people are entitled, but the trainings are clearly deficient due to the systemic failure to provide services required under ADA, United States Constitution, and Nevada Constitution.

32.  LVMPD is responsible for the hiring, control, and supervision of all of CCDC's staff, medical staff, and corrections officers and agents.

33. LVMPD is responsible for implementing CCDC's policies and maintaining the health and safety of people detained at the facility.

34. LVMPD has systemically failed to honor its obligations under the ADA, the Rehabilitation Act, and the United States Constitution.

35. LVMPD fails to provide deaf people detained at CCDC effective communication by denying deaf people access to qualified interpreters and other necessary auxiliary aids and services for medical evaluations, disciplinary proceedings, and therapeutic, educational, and religious programming offered by the jail. This constitutes a failure to provide constitutionally minimum standards of medical treatment.

36. LVMPD does not provide deaf people detained at CCDC the same access to telecommunication devices as hearing people.

37. For example, LVMPD does not make videophones ("VP")[4] available to deaf people.

38. Instead, LVMPD only offers a teletypewriter ("TTY") to deaf people at CCDC.

39. TTY is an antiquated technology that requires the use of a written language like English. For a person whose primary language is ASL, this is an ineffective alternative.

40. LVMPD does not provide deaf people detained at CCDC with any auxiliary aids or services when given instructions from corrections officers. When corrections officers explain anything to people detained at CCDC from ordinary booking procedures to life-or-death matters such as COVID-19, these explanations are conducted without interpreter services or written materials.[5]

---

[4] Videophones are video conferencing technology which allow people with hearing or speech disabilities to make telephone calls over a broadband connection. In direct VP to VP calls, both parties to the conversation can see each other and communicate directly via ASL. Deaf and hard of hearing people can also use a videophone to make calls to people who do not use sign language via Video Relay Service ("VRS"). On a VRS call, the signer communicates with a communication assistant in ASL and the communications assistant then speaks what is signed to the person on the other end of the call, and signs responses from that person back to the signer.

[5] LVMPD may occasionally provide written materials upon request, such as the Inmate Handbook, but this requires an affirmative request from the detainee.

41.   LVMPD uses only auditory signals for most announcements or alerts at CCDC, meaning that deaf people frequently miss these announcements and alerts.

42.   LVMPD, through its lack of appropriate policies and practices, fails to provide communication access for deaf and hard of hearing people in LVMPD's custody and control. Specifically, LVMPD routinely fails to provide qualified interpreters and other auxiliary aids and services for deaf and hard of hearing people in custody and under supervision.

43.   LVMPD's failure to ensure communication access deprives deaf and hard of hearing people under LVMPD's control of effective communication in critical situations, including medical and mental health appointments, health and safety announcements, and disciplinary hearings.

44.   LVMPD also deprives deaf and hard of hearing people who are detained at CCDC of necessary auxiliary aids and services, such as qualified interpreters, during important programs, such as educational classes, rehabilitative courses, and religious services.

<u>Christopher Jones' Detention at CCDC</u>

45.   Jones was incarcerated at CCDC from November 27, 2019, through October 7, 2022.

46.   Jones was incarcerated at CCDC in pretrial detention until November 16, 2021.

47.   On November 16, 2021, he was sentenced to a fixed period of probation of five (5) years.

48.   As a term of his probation, Jones was required to serve three hundred twenty-five days (325) days in CCDC, which ended on October 7, 2022.

49.   Jones is deaf and his primary and preferred language is ASL.

50.   Jones requires auxiliary aids and services and reasonable modifications to communicate effectively with people who do not use ASL.

51.   As such, he is entitled to qualified interpreters, other auxiliary aids and services, and reasonable modifications to LVMPD policy under law, including Title II of the Americans with Disabilities Act (ADA) and the Rehabilitation Act, to ensure that communications with him

are as effective as those with a similarly-situated hearing detained person.

52.    While Jones was detained at CCDC, LVMPD did not provide Jones with qualified interpreters, other auxiliary aids and services, and reasonable modifications to LVMPD policy to ensure that communications with him were as effective as those with a similarly-situated hearing detained person.

53.    Jones was only able to consistently attempt to communicate while incarcerated with LVMPD staff and other detained people through written notes because interpreter services were not provided, but this communication was ineffective.

54.    CCDC's provided Jones a tablet to connect him to remote interpreter services only during the last few months of Jones' detention.

55.    Writing utensils, such as pens and paper, were not provided to Jones free of charge. He either had to purchase these items from the commissary or was denied these items while in solitary confinement or the psychiatric unit.

56.    Based upon Jones' observations, corrections officers who rotated through Jones' units did not appear to have had experience working with deaf detained people based on the corrections officers' treatment of Jones.

57.    Jones is now out of custody on supervised probation in case C-21-353570-1 before the Eighth Judicial District Court of the State of Nevada.

58.    As part of his probation, Mr. Jones must follow the conditions imposed by the judge at the time of his sentencing.

59.    Many of the conditions imposed on Mr. Jones require him to engage in conduct that he would otherwise not be required to do.

60.    Many of the other conditions bar Mr. Jones from engaging in activities that are otherwise legal.

61.    As a condition of his probation, Mr. Jones must follow any "directive" of his probation officer and his "conduct" is required to "justify the opportunity granted to [him]", though these terms are not defined.

62. As a condition of his probation, Mr. Jones is required to provide a monthly written report to his probation officer.

63. As a condition of his probation, Mr. Jones is required to meet regularly with his probation officer based upon a schedule set by that officer.

64. As a condition of his probation, Mr. Jones must maintain a place of residence, report that residence to his probation officer, and not change that residence without notification to the officer.

65. As a condition of his probation, Mr. Jones may not possess or have access to a "weapon", though his terms of probation do not define what constitutes a "weapon".

66. As a condition of his probation, Mr. Jones may not associate with anyone convicted of felony, on probation, on parole, or detained in a correctional institution without prior permission from his probation officer.

67. As a condition of his probation, Mr. Jones must maintain or seek employment and provide proof of that employment to his probation officer.

68. As a condition of his probation, Mr. Jones is required to subject himself to random drug testing on a weekly basis.

69. As a condition of his probation, Mr. Jones must refrain from the use, possession, or control of any alcoholic beverage.

70. As a condition of his probation, Mr. Jones was required to complete a mental health and substance abuse evaluation.

71. As a condition of his probation, Mr. Jones is required to complete any recommended counseling from that evaluation.

72. As a condition of his probation, Mr. Jones comply with all prescribed medication recommended by that evaluation.

73. If Mr. Jones is accused of violating any of these conditions, his probation officer may immediately arrest him.

74. If Mr. Jones is arrested for a probation violation, he will be transported to Nevada and re-incarcerated at CCDC.

75. This includes any "technical" violations where Mr. Jones has not broken any laws, such as missing a drug test or a meeting with his probation officer.

76. If not provided the appropriate auxiliary aids and services and reasonable modifications, people who are deaf or hard of hearing are more likely to be penalized under community supervision due to miscommunication with officials who are supervising them and the lack of auxiliary aids and services and reasonable modifications for the programs that they are expected to attend as condition of release.

77. Mr. Jones has already struggled with this lack of auxiliary aids and services and reasonable modifications: when he has been asked to sign paperwork prior to giving a urine sample for drug testing, he has been expected to do so without an ASL interpreter to translate the paperwork prior to signing.

78. If Mr. Jones is arrested for a probation violation, he will be incarcerated in CCDC until he can appear before the court in Nevada's Eighth Judicial District that is supervising his probation.

79. He will continue to be incarcerated in CCDC until the supervising court decides to either re-instate or revoke his probation.

<u>Instructions During Booking</u>

80. Jones went through CCDC's booking process over a three-day span from November 27, 2019 to November 29, 2019.

81. During that three day period LVMPD did not provide Jones with an interpreter or any other auxiliary aids to assist him in communicating with staff.

82. LVMPD continued to deny Jones auxiliary aids and services and reasonable modifications at his intake and booking, even after he specifically requested an interpreter.

83. CCDC staff verbally prompt hearing people for a significant amount of information during the booking process to ensure proper classification, including identifying information and

health history.

84.     Hearing detained people are provided a significant amount of information verbally by CCDC staff during the booking process, including basic procedures at CCDC and how to seek assistance for emergencies.

85.     No information was effectively communicated by LVMPD to Jones during the booking process as LVMPD did not provide information in a language that he could understand. Specifically, LVMPD did not provide an ASL interpreter or any other auxiliary aid or service to ensure effective communication with Jones.

86.     Moreover, although LVMPD only offers a TTY to deaf detained people—which is an ineffective means to communicate for a person whose primary language is ASL—no LVMPD staff members at CCDC explained to Jones during booking that a TTY was available to him upon request.

87.     Upon information and belief, Jones did not receive CCDC's Inmate Handbook when he was initially incarcerated at CCDC, causing him to be entirely uninformed of CCDC's rules and procedures.

88.     For example, CCDC's staff never explained the formal grievance process and the appeals process to Jones.

89.     If CCDC staff did explain the formal grievance process and appeals process to Jones, it was not communicated in ASL or other manner that Jones would have been able to understand.

90.     All information Jones received about CCDC's grievance process was provided to him by other detained people through handwritten messages.

91.     For example, in an incident that occurred on September 30, 2020, Jones asked a corrections officer in his module for a Citizen Review Board Complaint Form by writing the question on a piece of paper, believing this was the primary grievance system. The corrections officer repeatedly questioned Jones and gave him a formal rule violation for disrupting his module. As a result of this violation, Jones was brought before the Conduct Adjustment Board ("CAB"),

which placed him in solitary confinement because of his requests.

92.     Jones suffered arbitrary discipline as a result of having no information on what rules and procedures LVMPD mandates at CCDC.

93.     When Jones finally learned LVMPD's grievance process, he found that LVMPD expects people detained at CCDC to submit grievances in written English on an electronic kiosk located in the detention units.

94.     LVMPD does not have a mechanism to allow the submission of grievances in ASL, nor do they provide auxiliary aids or services to ensure effective communication for deaf people whose primary form of communication is ASL.

<u>Issues with Instructions and Programming</u>

95.     Every day, LVMPD's staff at CCDC share essential information with all detained people verbally, announcing mealtimes, pill calls, the beginning and end of daily count, laundry calls, and shakedowns. This information is conveyed almost exclusively through speech and auditory cues.

96.     Deaf and hard of hearing people detained at CCDC almost never receive this information. As a result, they miss meals, medication, appointments, laundry, and work. Deaf and hard of hearing incarcerated people are sometimes awakened by their cellmates or guards banging on the beds but often they are not awakened at all and miss these events.

97.     Jones often missed announcements and alerts that only used auditory signals. For example, Jones often missed "free time" periods each day because the signal for these periods is seven loud "beeps." Without any non-auditory signals or indications that "free time" periods were occurring, Jones had no way of knowing when those periods occurred.

98.     Jones repeatedly requested the LVMPD staff serving in his detention unit in CCDC notify him if an auditory signal was provided for "free time" or other events. Aside from one staff member temporarily stationed in Jones's unit on the sixth floor of CCDC for about three (3) days around May of 2022 who provided him with notice, Jones's requests were ignored.

99.     Other than the *ad hoc* generosity of a single staff member, LVMPD's staff at CCDC

failed to provide any visual or tactile cues when making an alert or announcement, including fire alarms, instead relying exclusively on auditory signals.

100.    While Jones was incarcerated, corrections officers regularly communicated important verbal announcements to Jones's unit.

101.    When these announcements were made, LVMPD did not provide an ASL interpreter, written materials, or other auxiliary aid or service to make the verbal announcements accessible to Jones.

102.    Jones had to rely entirely on other detained people to let him know what information was contained in those announcements.

103.    Specifically, during the COVID-19 pandemic, CCDC's staff gave multiple presentations to detained people about COVID-19 and the precautions the detained people would need to take to protect themselves.

104.    All of these presentations by CCDC's staff were given orally without any visual aids, written explanations, or an interpreter.

105.    Jones did not receive any information about the COVID-19 pandemic until another detained person explained the situation to him through handwritten messages which were generally ineffective as Jones' primary and preferred language is ASL.

106.    LVMPD also failed to ensure that the televisions in Jones' CCDC unit had the closed captioning on, denying him an opportunity that hearing people had to use the television.

107.    Beyond announcements and alerts, Jones was unable to meaningfully participate in any classes or group therapy offered by LVMPD at CCDC for rehabilitation for most his detention.

108.    As documented in multiple grievances Jones filed while incarcerated at CCDC, Jones requested an interpreter so he could participate in CCDC's programs, services, and activities, but LVMPD denied his requests.

109.    For example, Jones was placed in group therapy but was not offered an interpreter and, therefore, was unable to share his experience and thoughts with the group or the coordinator.

110.    Jones also wanted to attend classes and religious services offered at CCDC but was

unable to participate without an interpreter.

Unequal Access to Telecommunications

111.    Ensuring that people detained at CCDC can connect with people outside of the facility is imperative for people detained pretrial to prepare their legal defense, people detained on criminal sentences to transition back to the outside world once their sentences are complete, and all detained people to cope with the psychological challenges of incarceration.

112.    As the federal government has recognized, "[t]elephone privileges are a supplemental means of maintaining community and family ties that will contribute to an inmate's personal development." 28 C.F.R. § 540.100.

113.    LVMPD provides hearing people detained at CCDC regular access to telephones to communicate with family, friends, attorneys, and other people outside of the jail.

114.    Phone banks are built into each unit used to house CCDC's general population.

115.    LVMPD provides consistent access to these phones to hearing people detained at CCDC who are housed in general population.

116.    Hearing people housed in these units may use these phones at any time designated as "free time" to contact friends, family, or anyone else outside of CCDC they may wish.

117.    Hearing people may can also consult with their attorneys, without cost, via specially designated "blue phones" that allow for confidential conversations that are available in each unit where CCDC houses its general population.

118.    Similar to the phones reserved for friends and family, the "blue phones" can be accessed at any time designated as "free time" by CCDC's staff.

119.    Jones was not provided access to any telecommunication device comparable to a telephone allowing for visual communication, i.e. VP or TTY, for the first eight months of his incarceration.

120.    LVMPD eventually provided Jones with a TTY, a technology considered significantly out-of-date by the deaf community, which did not allow Jones to effectively communicate with third parties.

121.    To even use the TTY provided by LVMPD, Jones required assistance from a hearing detained person, specifically Jones needed a hearing person to let him know whether the TTY had successfully connected as the TTY gives different auditory signals if it connects or not.

122.    TTY technology is 60-years-old, error-prone, failure-prone, and causes delays in communication.

123.    TTY is a device equipped with a keyboard and display screen to enable deaf and hard of hearing people to make and receive text-based telecommunication via telephone lines. This device allows the user to send and receive typed messages over telephone lines. TTY users can directly call other TTY users or they can call a person who does not have a TTY via a relay service. If directly calling another TTY user, the TTY user types a message into the TTY, which is then displayed on the other user's TTY, and vice versa. If using a relay service, the TTY user types a message into the TTY, which the relay service operator receives and relays, by standard phone, to a person who does not have a TTY. The standard phone user then replies to the TTY user by speaking their message to the relay service operator who types the message to the TTY user, which is displayed on their TTY display screen. This timely, ineffective process continues back and forth throughout an entire conversation. A standard phone user can also place a call through a relay service operator to a TTY user.

124.    TTY requires the deaf user to type messages in English. People whose first language is ASL are often not proficient in written English, and therefore, TTY is not accessible for people who have extremely limited use of English. Moreover, TTY is ineffective even when used by a person fluent in English. Typed TTY conversations necessarily take much more time than traditional voice calls or video calls; TTY communications do not include important linguistic information such as emotion, tone, or inflection, which can affect meaning and message significantly; TTY messages are often garbled or indecipherable; and TTY users cannot interrupt each other as typical in a natural, free-flowing conversation.

125.    Put simply, TTY is an outdated technology that does not provide equally effective communication for most deaf and hard of hearing people.

126.     For the most part, deaf and hard of hearing people in the United States have abandoned the outdated and ineffective TTY.

127.     Instead, deaf and hard of hearing people generally use videophones and captioned telephones. Indeed, not only do many prisons and jails around the country offer videophones to deaf detained people, but several courts have ordered correctional facilities to provide videophones to people in those facilities.[6]

128.     There is no valid security basis to deny deaf detained people access to videophones.

129.     In CCDC, where calls are limited to 15 minutes, a TTY is untenable because the TTY communication takes much longer due to the time spent typing and the slow speeds of TTYs.

130.     Jones had to share the TTY with at least two other deaf people detained at CCDC in different units, meaning that the TTY was moved from unit-to-unit. When the TTY was not in Jones's unit, he did not have access to it.  This is stark juxtaposition to hearing detained people who can call from their phone bank whenever said detained people are on free time due to the abundance of phones for hearing detained people.

131.     When Jones requested the TTY and it was not in his unit, he routinely had to wait up to twenty-four (24) hours to use the TTY, even waiting up to a week in some instances.

132.     Moreover, the visibly dirty TTY was not cleaned after each use during the COVID-19 pandemic and was covered in dust with no plastic cover. The person in Jones' unit responsible for cleaning the TTY phone neglected this duty. Jones informed several officers in his unit that the TTY phone was not getting cleaned. When the TTY was not Jones's unit, he had no way of knowing whether it was being cleaned after use. Further, Jones filed a grievance about the TTY phone not being cleaned to a LVMPD Lieutenant.

133.     Jones requested a videophone, but LVMPD's staff at CCDC denied this request.

---

[6] *See, e.g.*, U.S. Dep't of Just., Justice Department Reaches Agreement with Vermont Department of Corrections to Improve Access for Inmates with Disabilities (Oct. 28, 2021), https://www.justice.gov/opa/pr/justice-department-reaches-agreement-vermont-department-corrections-improve-access-inmates; Christie Thompson, *'Prison Within a Prison': New Mandate Offers Lifeline for Deaf People in Custody*, THE MARSHALL PROJECT (Mar. 21, 2023), https://www.themarshallproject.org/2023/03/21/deaf-prison-fcc-video-calls.

134.    Like other detained people, Jones was permitted to have "video visits" with his attorney, but unlike contacting a hearing person at CCDC via the "blue phone", Jones's defense attorney was required to preschedule any video visits with CCDC.

135.    Jones could not initiate a video visit with his attorney; only his attorney had the ability to schedule video visits.

136.    Because Jones did not have access to a videophone, the Clark County Public Defender's Office had to schedule a video visit and then arrange for an for an interpreter to also attend the video visit for Jones to effectively communicate with his attorney, resulting in delays that would not occur if a videophone had been made available.

Medical Treatment and Evaluations

137.    LVMPD failed to provide Jones the ability to communicate effectively while incarcerated at CCDC by denying him access to qualified interpreters and other auxiliary aids for medical appointments, including, for example, appointments on November 27, 2019; December 2, 2019; December 3, 2019; December 6, 2019; July 16, 2020; November 21, 2020; November 16, 2021; and March 7, 2022.

138.    Specifically, CCDC's staff denied Jones—after multiple, documented requests—a qualified interpreter for multiple medical appointments.

139.    In one instance on December 6, 2019, Jones did not answer most of the questions on a "Medical History and Physical Assessment with Mental Health" because he was not provided an interpreter, despite having informed the medical professional performing the assessment that he could not properly answer the questions because he required an interpreter.

140.    CCDC's staff failed to provide Jones with an interpreter during mental health or other evaluations where other detained people would have been able to talk to the medical professional.

141.    For example, Jones reported experiencing hallucinations to CCDC staff.

142.    He was interviewed by CCDC's psychiatric staff but CCDC failed to provide an ASL interpreter for that interview.

143.    As a result, communication was ineffective, and CCDC's staff did not provide Jones any diagnosis, medication, or follow up care.

144.    During the COVID-19 pandemic, CCDC's staff provided hearing people detained at CCDC with information about the COVID-19 vaccine and its effects to allow detained people to make an informed decision as to whether to receive the COVID-19 vaccine.

145.    LVMPD did not provide Jones with this information because the medical professionals at CCDC were unable to communicate with Jones in ASL.

146.    Jones was eventually offered a COVID-19 vaccine, but he declined because LVMPD failed to provide him with information sufficient to make an informed decision, leaving him with several unanswered concerns about the vaccine and having to obtain insufficient "answers" from other detained people.

Disciplinary Actions

147.    While Jones was detained at CCDC, he was subject to disciplinary proceedings on multiple occasions.

148.    On multiple occasions, the allegations against him were a direct result of CCDC's failure to provide auxiliary aids and services or reasonable modifications for his disability.

149.    On multiple occasions, LVMPD failed to provide Jones with appropriate auxiliary aids and services or reasonable modifications during the disciplinary proceedings themselves.

150.    As a result of the allegations against him, on multiple occasions, Jones was housed in disciplinary housing where he was not provided writing utensils or any other means to communicate with either other incarcerated people or CCDC staff.

151.    On December 3, 2019, Jones was accused of "Refusing to Obey a Direct Order From Staff." Specifically, CCDC staff accused Jones of insisting on speaking to a member of CCDC's psychiatric staff rather than return to his bunk when ordered to do so by a CCDC Corrections Officer.

152.    Due to this allegation, Jones was transferred to the solitary confinement unit that same day.

153.    CCDC's investigator recommended that Jones receive the maximum sentence for the violation even though that same investigator acknowledged that (1) CCDC's staff members were unaware that Jones was deaf when they orally ordered Jones to return to his bunk, and (2) Jones calmed down once someone on the scene communicated with him in rudimentary ASL why corrections officers were denying him access to CCDC's psychiatric staff.

154.    Jones was not given a hearing for this violation until December 6, 2019.

155.    At the hearing, LVMPD did not provide Jones with an interpreter or any other effective auxiliary aid or service.

156.    Due to the lack of interpreter, Jones was only able to provide a written statement, specifically "the hand gesture (sic) [the corrections officer] was using does not mean stop.. i didn't know what he was saying."

157.    Jones was found "guilty" of the alleged violation during the hearing.

158.    As a result of the December 3rd incident, Jones remained in solitary confinement until December 11, 2019.

159.    On September 30, 2020, Jones was accused of "Disrupting the Module" for not responding to a correction officer's verbal commands that Jones could not hear.

160.    The officer also accused Jones of "complaining loudly to the inmates around his bunk area," though there was no indication that Jones knew he was being loud.

161.    Jones was transferred to a disciplinary unit that same day.

162.    The corrections officer recommended that Jones spend ten (10) days in disciplinary housing for the violation, claiming that Jones was manipulative because "[Jones] would not acknowledge what [the officer] wrote on a paper tablet unless [the officer] let [Jones] hold the tablet" and because the officer believed that Jones could read his lips even after Jones stated he could not.

163.    Jones did not have a hearing regarding the allegations until October 8, 2020.

164.    LVMPD did not provide Jones with an interpreter or any other effective auxiliary aid or service for the hearing.

165.    Jones was found "guilty" of this alleged violation during the hearing.

166.    As a result of the September 30th incident, Jones remained in disciplinary housing until October 14, 2020.

167.    On February 3, 2022, Jones was accused of "Possession of Unauthorized Items, Contraband, or Clothing," for allegedly being in possession of "2 bags of coffee, 1 bowl, 1 tuna, 1 chili, 1 bag of rice, and 1 peanut butter."

168.    As a result of this allegation, he was transferred to a disciplinary unit.

169.    Jones was initially scheduled for a disciplinary hearing on February 8, 2022, but the hearing was unable to go forward as the officers failed to provide an interpreter, and unlike on previous occasions, CCDC staff agreed that an interpreter was a necessary auxiliary aid or service.

170.    Jones's hearing was delayed as CCDC acquired the services of an interpreter for his hearing.

171.    Jones ultimately remained in disciplinary housing until February 12, 2022, due to the delay.

**FIRST CLAIM FOR RELIEF**
**Discrimination on the Basis of Disability in Violation of Title II of the ADA (42 U.S.C. § 12131, *et seq.*)**

172.    Jones alleges and incorporates by reference each and every allegation above as if fully set forth herein.

173.    On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

174.    Jones is a "qualified individual with a disability" within the meaning of the ADA.

175.    Public entities are required under the ADA to "take appropriate steps to ensure that communication with . . . participants . . . with disabilities are as effective as communication with

20

others." 28 C.F.R. § 35.160(a)(1). Ensuring effective communication includes "furnish[ing] appropriate auxiliary aids and services," 28 C.F.R. § 25. 160(b)(1), including "[q]ualified interpreters . . . real-time computer-aided transcription services . . . telephone headset amplifiers; assistive listening devices . . . telephones compatible with hearing aids; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones[.]" 28 C.F.R. § 35.104.

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of the individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2).

176.    "Primary consideration" means that "[t]he state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden." U.S. Dep't of Just., ADA Requirements: Effective Communication (Jan. 1, 2014), ada.gov/resources/effective-communication. *See also, e.g.*, 28 C.F.R. § 35.164; 28 C.F.R. Pt. 35, App. B ("The public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice. . . . The public entity shall honor the choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164."). As explained in the U.S. Department of Justice's ADA Title II Technical Assistance Manual, "[i]t is important to consult with the individual to determine the most appropriate auxiliary aid or service, because the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective." U.S. Dep't of Just., Title II Technical Assistance Manual, Section II-

7.1100, ada.gov/taman2.html.

177.   In providing any aid, benefit or service, a public entity "may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in an aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others." 28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), (vi). A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the natures of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

178.   LVMPD violated the ADA and its regulations by, *inter alia*: (a) failing to provide effective communication to Jones, including communication with LVMPD staff, medical personnel, other detained people, and people outside of CCDC; and (b) failing to make reasonable modifications to policies, practices, and procedures to avoid disability discrimination in handcuffing, administrative and punitive isolation, administrative grievance processes, and emergency planning. Specifically, LVMPD failed to provide Jones with a qualified interpreter during mental health evaluations, medical examinations, disciplinary hearings, classes and religious services, group therapy, and crucial interactions with LVMPD staff, such as the booking process and essential presentations about the ongoing COVID-19 pandemic.

179.   LVMPD also failed to provide Jones with a telecommunications device during incarceration at CCDC. While hearing people housed in CCDC's general population may freely use phones during free time, deaf people must request to use an antiquated telecommunication device, and as Jones has learned, such a request may not be answered until days later. Furthermore, the only such devices offered to deaf people detained at CCDC are TTYs, which deaf people like

Jones cannot use without the assistance of a person who can hear. CCDC does not provide videophones, the standard telecommunication device used by the signing deaf community today. There is no valid security basis to deny deaf detained people access to videophones, which are safely used in secure correctional facilities across the country.

180.    LVMPD pervasively failed to provide auxiliary aids and services to Jones  at CCDC despite acknowledging these requirements in its written policies and procedures. LVMPD failed to supplement auditory signals with any visual or tactile cues when making an alert or announcement, including fire alarms. LVMPD failed to ensure that the televisions in Jones' unit had the closed captioning on. LVMPD required Jones to buy his own writing materials, which were the only means for Jones to communicate. However, "[a] public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part." U.S. Dep't of Just., Americans with Disabilities Act Title II Regulations, Section 35.130, https://www.ada.gov/law-and-regs/title-ii-2010-regulations/.

181.    LVMPD also failed to establish and provide personnel training, course materials, and other mechanisms at CCDC while Jones was incarcerated at the facility to ensure that such policies as they have established or may establish in the future to comply with the ADA with regard to deaf or hard of hearing detained people or people under LVMPD supervision have been and will be propagated effectively to wardens, guards, LVMPD officers, and other personnel to produce necessary understanding and compliance.

182.    LVMPD discriminated against Jones with deliberate indifference to his communication needs, causing him to endure humiliation, fear, anxiety, and emotional distress.

183.    Jones is entitled to damages, declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

/ / /

/ / /

## SECOND CLAIM FOR RELIEF
### Discrimination on the Basis of Disability in Violation of
### Section 504 of the Rehabilitation Act (29 U.S.C. § 794, *et seq.*)

184.    Jones alleges and incorporates by reference each and every allegation above as if fully set forth herein.

185.    Section 504 of the Rehabilitation Act states that no

> qualified individual with a disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).

186.    Jones is a "qualified individual with a disability" within the meaning of the U.S. Department of Justice's Americans with Disabilities Act Title II Regulations. U.S. Dep't of Just., Americans with Disabilities Act Title II Regulations, Section 35.104, https://www.ada.gov/law-and-regs/title-ii-2010-regulations/.

187.    LVMPD receives "[f]ederal financial assistance" for CCDC within the meaning of 29 U.S.C. § 794(a).

188.    The operations of CCDC are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)—(B) and/or (b)(2)(B).

189.    The Rehabilitation Act requires that recipients of federal financial assistance, including LVMPD,

> shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving federal financial assistance.

28 C.F.R. § 42.503(f).

190.    Appropriate auxiliary aids include, but are not limited to, "qualified interpreters . . . and telephonic devices." 28 C.F.R. § 42.503(f).

191.    As detailed herein, LVMPD violated Section 504 and United States Department of Justice regulations by, *inter alia*: (a) failing to provide effective communication to Jones, including

communication with LVMPD staff, medical personnel, other detained people, and people outside of CCDC; and (b) failing to make reasonable modifications to policies, practices, and procedures to avoid disability discrimination in handcuffing, administrative and punitive isolation, administrative grievance processes, and emergency planning. Specifically, LVMPD failed to provide Jones with a qualified interpreter during mental health evaluations, medical examinations, disciplinary hearings, classes and religious services, group therapy, and crucial interactions with LVMPD staff, such as the booking process and essential presentations about the ongoing COVID-19 pandemic.

192.   LVMPD also failed to provide Jones with a telecommunications device while incarcerated at CCDC. While hearing detained people housed in general population may freely use phones during free time, deaf detained people must request to use an antiquated telecommunication device, and as Jones has learned, a request may not be answered until days later. Furthermore, the only phones offered to deaf detained people are TTY phones, not the videophones that are commonly used by the deaf community today. There is no valid security basis to deny deaf detained people access to videophones, which are safely used in secure correctional facilities across the country.

193.   LVMPD pervasively failed to provide Jones with auxiliary aids and services despite acknowledging these requirements in its written policies and procedures. LVMPD failed to supplement auditory signals with any visual or tactile cues when making an alert or announcement, including fire alarms. LVMPD failed to ensure that the televisions in Jones' unit had the closed captioning on. LVMPD required Jones to buy his own writing materials, which were the only means for Jones to communicate.

194.   LVMPD also failed to establish and provide personnel training, course materials, and other mechanisms at CCDC to ensure that such policies as they have established or may establish in the future to comply with Section 504 with regard to deaf or hard of hearing detained people or people under LVMPD supervision have been and will be propagated effectively to wardens, guards, LVMPD officers, and other personnel to produce necessary understanding and

compliance.

195.    LVMPD failed to provide Jones with appropriate auxiliary aids and services in violation of the Rehabilitation Act and denied Jones the same access to services, benefits, activities, programs, and privileges as the access provided to hearing detained people at CCDC. These failures are an illustration of LVMPD's routine practices which directly conflict with its own written policies and procedures.

196.    Jones is entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
**Violation of the Eighth Amendment for a Deliberate Indifference to a Substantial Risk of Harm to Health and Safety after Conviction (42 U.S.C. § 1983)**

197.    Jones alleges and incorporates by reference each and every allegation above as if fully set forth herein.

198.    Under the Eighth Amendment of the U.S. Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII.

199.    LVMPD violated the Eighth Amendment of the United States Constitution by its act of deliberate indifference to the medical needs of Jones while he was incarcerated pursuant to a judgement of conviction. As a prisoner, Jones was guaranteed the right to proper medical care pursuant to the Eighth Amendment.

200.    As made clear by its own policies and trainings, LVMPD is well aware it must provide auxiliary aids to deaf detained people if requested.

201.    After November 16, 2021, and after documented requests, LVMPD failed to provide Jones with a qualified interpreter and other auxiliary aids during mental health evaluations, medical examinations, classes and religious services, group therapy, and crucial interactions with LVMPD staff while at CCDC, such as the booking process and essential presentations about the ongoing COVID-19 pandemic.

202.    Specifically, even when Jones requested an interpreter for his medical

appointments and mental health evaluations, LVMPD's staff at CCDC denied Jones an interpreter, while other detained people would have been able to talk to a medical professional. In the context of complex, lengthy, and essential medical examinations and mental health evaluations, the presence of a qualified interpreter is imperative to obtaining high-quality and punctual healthcare. Jones was also not given an explanation as to how medications prescribed to him worked or if the medications had any potential side effects.

203.   LVMPD, by its act of deliberate indifference in failing to provide auxiliary aids to Jones, violated the Fourteenth Amendment. Had LVMPD not acted with deliberate indifference to the obvious and serious disability of Jones, he would have received proper medical care.

204.   LVMPD's failure to comply with its duties under the Fourteenth Amendment has resulted in harm to Jones.

205.   Jones is entitled to compensatory damages, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
**Violation of Article 1, § 6 of the Nevada Constitution for a Deliberate Indifference to a Substantial Risk of Harm to Health and Safety After Conviction**

206.   Jones alleges and incorporates by reference each and every allegation above as if fully set forth herein.

207.   Under Article 1, § 6 of the Nevada Constitution, "cruel or unusual punishment" shall not be inflicted.

208.   LVMPD violated Article 1, § 6 of the Nevada Constitution by its act of deliberate indifference to the medical needs of Jones to the extent he was detained pursuant to a judgment of conviction. Specifically, Jones was deprived of his rights against cruel or unusual punishment stemming from LVMPD's failure to provide Jones with a qualified interpreter and other auxiliary aids while incarcerated at CCDC.

209.   As made clear by its own policies and training, LVMPD is well aware it must provide auxiliary aids to deaf detained people if requested.

210.   After documented requests, LVMPD failed to provide Jones with a qualified

interpreter and other auxiliary aids at CCDC during mental health evaluations, medical examinations, classes and religious services, group therapy, and crucial interactions with LVMPD staff, such as the booking process and essential presentations about the ongoing COVID-19 pandemic.

211.    Even when Jones requested an interpreter for his medical appointments and mental health evaluations, LVMPD denied Jones an interpreter, while other detained people at CCDC would have been able to talk to a medical professional. In the context of complex, lengthy, and essential medical examinations and mental health evaluations, the presence of a qualified interpreter is imperative to obtaining high-quality and punctual healthcare. Jones was also not given an explanation as to how medications prescribed to him worked or if the medications had any potential side effects.

212.    LVMPD, by its act of deliberate indifference in failing to provide auxiliary aids to Jones, violated Article 1, § 6 of the Nevada Constitution. Had LVMPD not acted with deliberate indifference to the obvious and serious disability of Jones, he would have received proper medical care.

213.    LVMPD's failure to comply with its duties under Article 1, § 6 of the Nevada Constitution has resulted in harm to Jones.

214.    Jones is entitled to compensatory damages, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## V.      PRAYER FOR RELIEF

WHEREFORE, Jones respectfully prays that the Court grant the following relief:

1.      A declaration that LVMPD violated Jones' rights under Title II of the ADA (42 U.S.C. § 12131, *et seq.*);  Section 504 of the Rehabilitation Act (29 U.S.C. § 794, *et seq.*); the Eighth Amendment of the United States Constitution; Article 1, § 6 of the Nevada Constitution;

2.      An order enjoining LVMPD from engaging in the unlawful discrimination complained of herein at CCDC;

3.      An order granting injunctive relief requiring LVMPD to comply with its obligations

under the ADA, the Rehabilitation Act, and the United States Constitution and implement appropriate remedial measures at CCDC;

4.      An order awarding Jones his actual and exemplary/punitive damages, in an amount to be determined at trial;

5.      An order awarding Jones his pre-judgment and post-judgment interest as allowed by law;

6.      An order awarding Jones his attorneys' fees and costs of this action; and

7.      An order awarding any and all other available damages and such other further relief as the Court deems just and proper.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 28, Jones hereby demands a trial by jury on all issues for which a trial by jury may be had.

DATED this 11th day of January, 2024.

**DICKINSON WRIGHT PLLC**


*/s/  John L. Krieger*
John L. Krieger, Esq.
Kevin D. Everage, Esq.
Brady A. Bathke, Esq.
3883 Howard Hughes Parkway, Suite 800
Las Vegas, Nevada 89169

**AMERICAN CIVIL LIBERTIES UNION OF NEVADA**
Christopher Peterson, Esq.
Jacob Smith, Esq.
4362 W. Cheyenne Ave.
North Las Vegas, Nevada 89032

**NATIONAL ASSOCIATION OF THE DEAF**
Brittany Shrader (*pro hac vice to be submitted)*
8630 Fenton Street, Suite 820
Silver Spring, MD 20910

*Attorneys for Plaintiff*